**UNITED AIR LINES, Inc., v. CIVIL AERO-
NAUTICS BOARD et al.**

No. 8979.

United States Court of Appeals
District of Columbia.

Argued Feb. 8, 1946.

Decided April 22, 1946.

Mr. Paul M. Godehn, of Chicago, Ill., with whom Mr. Stanley T. Wallbank, of Denver, Colo., was on the brief, for petitioner. Mr. James Francis Reilly, of Washington, D. C., also entered an appearance for petitioner.

Mr. John H. Wanner, Assistant General Counsel, Civil Aeronautics Board, and member of the Bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of Court, with whom Mr. George C. Neal, General Counsel, both of Washington, D. C., and Mr. Russell S. Bernhard, Senior Attorney, Civil Aeronautics Board, of Chicago, Ill., were on the brief, for respondent Civil Aeronautics Board. Mr. Wendell Berge, Assistant Attorney General, and Mr. Edward Dumbauld, Special Assistant to the Attorney General, also were on the brief for respondent Civil Aeronautics Board.
Board.

Mr. Hugh W. Darling, of Los Angeles, Cal., for respondent Western Air Lines, Inc.

Mr. James K. Crimmins, of New York City, with whom Mr. William J. Harnisch, of New York City, was on the brief, for respondent Transcontinental & Western Air, Inc.

Before GRONER, Chief Justice and CLARK and PRETTYMAN, Associate Justices.

PRETTYMAN, Associate Justice.

This case is here upon a petition to review orders of the Civil Aeronautics Board.[1] In 1943 Government authorities proposed to establish a new air route between Denver, Colorado, and Los Angeles, California, via Las Vegas, Nevada, Cedar City, Utah, and Grand Junction, Colorado. Four carriers applied for certificates of public convenience and necessity authorizing them to operate over the new route. The applications were consolidated for hearing before an examiner, and extensive testimony was taken. The examiner recommended that the application of United Air Lines, Inc., to which company we shall refer as "United", be granted and the other applications denied. Upon review of the examiner's report, and after hearing, the Board issued its opinion, including its findings of fact and conclusions, and entered an order in which the application of Western Air Lines, Inc., to which company we shall refer as "Western", was granted and the other applications denied. United petitioned this court for review of that order and the order denying reconsideration.

United operates a transcontinental air line from cities on the east coast, via Omaha, Cheyenne and Salt Lake City, to termini at Seattle, Portland and San Francisco. It operates two routes between San Francisco and Los Angeles-San Diego. Transcontinental & Western Air, Inc., another applicant in the proceeding before the Board, operates a transcontinental air line from eastern cities, via Kansas City, Wichita, Albuquerque and Boulder City, to a terminus in Los Angeles; and also operates a route from Los Angeles to San Francisco. American Airlines, Inc., not involved in this proceeding, operates a transcontinental air service on a route still farther south to a terminus in Los Angeles. Continental Air Lines, Inc., an applicant, operates routes between El Paso and Denver, El Paso and San Antonio, and Denver and Kansas City. Northwest Airlines, not involved in this proceeding, operates a route from the east coast, via Detroit, Chicago and Minneapolis, to termini in Portland and Seattle. Western, the successful applicant before the Board, operates a

---

[1] Sec. 1006 of the Civil Aeronautics Act of 1938, 52 Stat. 1024, 49 U.S.C.A. § 646.

north-and-south route from Los Angeles, via Las Vegas, Salt Lake City, Butte and Great Falls, to Lethbridge, Alberta; and also a route between Los Angeles and San Francisco. In general, therefore, there are four transcontinental carriers, two operating directly into Los Angeles and the other two (of which United is one) having their direct west-coast termini in Portland and San Francisco.

Los Angeles is the largest transcontinental-air-travel market on the west coast, being about as important in that respect as New York City is on the east coast. It produces more east-west air transportation than all other Pacific-coast cities combined. The most important east-west air channel is between New York and Los Angeles through Chicago.

The present United route has two possible connections with Los Angeles, one at Salt Lake City by junction with Western, and the other at San Francisco by junction with United's route down the coast. The latter possibility is too roundabout to be of practical consideration in the present problem.

The connection between United and Western at Salt Lake City has been the subject of attention by those companies and the Board for years. In 1937 the companies entered into the first equipment-interchange agreement in the history of air transportation. This agreement was designed to enable a sleeper plane to be operated on a through trip between New York and Los Angeles, with a change of crews at Salt Lake City. This proposal gave rise to litigation but was finally approved by the Board in 1940. Operations under it were discontinued in May, 1942, upon the acquisition of the sleeper planes by the Government. An attempt was made to effectuate a merger of the two companies, but the Board disapproved the proposal upon the ground that it was undesirable to permit the elimination of Western as an independent north-south carrier in the western section of the country.[2]

A direct route through Chicago, Denver and Las Vegas would be the shortest possible route between Boston-New York and Los Angeles. Until recent years, however, it has not been possible to provide direct air service between Denver and Los Angeles because of the height of the mountain ranges west of Denver. The advent of new DC-4 and Constellation equipment makes this operation possible. The proposed new route is the direct connection between Denver and Los Angeles. It is 129 miles shorter than the present route by United and Western via the junction at Salt Lake City.

If its application were granted, United would operate a single-plane through service from eastern cities directly to Los Angeles. Western, if its application were granted, would operate between Denver and Los Angeles and participate in transcontinental service by a junction with United at Denver, either by a connecting service or by an interchange agreement.[3]

■ The development of an adequate national system is one of the problems in air transportation to which the Civil Aeronautics Act is addressed. Because of the public interest in the airways, in air commerce and in air defense, the Government has a function in that development, and in our constitutional organization that function is of the legislative branch. The ascertainment of the facts in each particular phase of the problem and the application of the legislative mandate to the facts thus ascertained are functions susceptible of delegation by the legislature. The execution of the legislative mandate is, of course, a responsibility of the executive. In this development operation, the function of the judicial branch of government is inherently limited. The courts must make certain that the legislative enactment is within Constitutional limitations, that the executive program is within statutory limitations, and that a disputed executive action is within the terms of the legislative mandate, fairly based on facts fairly found, and not arbitrary, capricious or fanciful. Be-

[2] United Air Lines—Acquisition of Western Air, 1 C.A.A. 739 (1940).

[3] A connecting service is one in which passengers must change planes at the designated junction of two carriers. In an interchange service, passengers can remain aboard the plane and the operating crew changes at the junction point.

yond this, in a national project of this sort, the courts cannot go.

The executive action in controversy here is the designation of the operator of a new air route. No deprivation of property rights, no regulatory proposal, no maximum of rates or fares, is involved. Our consideration must be confined to the subject matter before us, and our function is correspondingly limited.

The Act provides that no air carrier shall engage in air transportation unless it first secures a certificate from the Board.[4] The Board is directed to issue a certificate if it finds that the applicant is fit, willing and able to perform such transportation properly, and to conform to the Act and the rules and regulations thereunder; and that such transportation is required by the public convenience and necessity.[5]

The Act requires the Board to consider, as being in the public interest and in accordance with public convenience and necessity, the development of an air-transportation system properly adapted to present and future needs of the nation, the regulation of such transportation so as to foster sound economic conditions in the industry, the promotion of adequate, economical and efficient service at reasonable rates, and competition to the extent necessary to assure a sound development.[6]

In the case at bar, pursuant to this complex concept of public convenience and necessity, the Board first determined that the general public interest would be served by the establishment of the new route. It concluded from many estimates submitted to it that any one of the applicants should be able to conduct the proposed service on an economically sound basis and without need of Government aid in excess of compensatory rates for mail. It found that the potential traffic was insufficient to support more than one service and that, therefore, it must choose between the applicants. Basing its action upon the comparative public interest, as measured by the maximum contribution which each applicant could offer, it eliminated Transcontinental & Western Air, Inc., and Continental Air Lines, Inc., from consideration. Thus far the determinations are not contested.

The Board then examined the conflicting interests presented by the two remaining applicants, United and Western, and its opinion clearly indicates the course of its thought. On the one hand, United stood willing and able to operate a single-plane through service. From the standpoint of the traveling public, this was obviously most desirable. On the other hand, the Board found that if the route were given to United, the previously sound economic position of Western would be seriously impaired. The testimony was that if United operated the new route, 41.7 per cent of Western's total system-revenue mileage would be diverted to United; that even taking into account the revenues to be derived from the operation of Western's recently authorized service between San

---

[4] Sec. 401(a), 49 U.S.C.A. § 481(a).

[5] Sec. 401(d).

[6] "Sec. 2. In the exercise and performance of its powers and duties under this Act, the Authority shall consider the following, among other things, as being in the public interest, and in accordance with the public convenience and necessity—

"(a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

"(b) The regulation of air transportation in such manner as to recognize and preserve the inherent advantages of, assure the highest degree of safety in, and foster sound economic conditions in, such transportation, and to improve the relations between, and coordinate transportation by, air carriers;

"(c) The promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices;

"(d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

"(e) The regulation of air commerce in such manner as to best promote its development and safety; and

"(f) The encouragement and development of civil aeronautics." 49 U.S.C.A. § 402.

Francisco and Los Angeles, and its operation to new intermediate points on its Route No. 13, the effect of the diversion would remain substantial and serious. This diversion, the Board found, would preclude Western's continuance as a strong competitive factor in air transportation in the western part of the country; would make it dependent upon the Government for substantial subsidies in the form of mail compensation in order to provide the service contemplated in its existing certificates; and would impair its present promise of long-range financial self-sufficiency. In addition to the financial considerations directly involved, the Board made clear, and in his concurring opinion the Vice Chairman relied upon, the necessity of the new route to the success of Western's other routes from the standpoint of available equipment and experience in this type of operation.

Mindful of its statutory duty, the Board weighed these competing considerations. The public interest represented by the convenience of large numbers of travelers pointed one way, while the public interest represented by the economic value of Western pointed the other. The problem was to resolve that contrariety. The Board concluded that the continued existence of Western as a strong competitive and economic force in national air transportation and as a strong carrier in the western part of the country was the overriding public interest.

██ That the Board is the final arbiter of the paramount public interest [7] is not disputed in this case. United's contentions are that the findings of the Board are not sufficiently clear, are not supported by substantial evidence and are insufficient to support its conclusion.[8]

We think that the findings are entirely clear. They describe the mileage, population, economic characteristics of the cities involved, transportation facilities, traffic data, including passengers by air between various points, transcontinental passengers carried by each carrier, postal receipts and pounds of mail, costs to the Government, the estimates presented by each applicant, etc. The conclusion rested upon the two ultimate findings to which we have referred, respecting the profitable operation of the route by any applicant and the effect upon Western of a diversion of its transcontinental traffic. These latter findings are, as we have seen, in general terms, not expressed in dollar amounts, but they are not ambiguous or obscure.

██ United says that the findings are obscure principally because of an uncertainty as to whether the through service contemplated via Denver would be connecting or interchange. We think it is clear that the Board thought, and found, that whichever service was to be used, Western should be awarded the route because of the injury it would suffer if the award were otherwise.

██ The contention as to lack of substantial evidence is directed at the two general findings to which we have referred. We think there was ample evidence to support them. The record contains elaborate data in the most minute detail, extending from the economic characteristics of the territory involved to itemized operating costs of established operations. All applicants presented detailed estimates of the expected results of the new operation. Western estimated that it would earn $974,875 from the operation of the new route with DC-3 equipment and $1,104,032 with DC-4 equipment. United estimated that it would earn $1,195,000 from its operation of the new route. Continental said it would earn $125,000 with DC-3 equipment on a connecting-service basis. Transcontinental & Western said that its additional expenses would be $18,000 a month on the new route and that 370 passengers at Denver would meet those costs.

[7] United States v. Pierce Auto Freight Lines, 1946, 66 S.Ct. 687.

[8] National Labor Relations Board v. Virginia Electric & Power Co., 1941, 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348; United States v. Carolina Freight Carriers Corp., 1942, 315 U.S. 475, 62 S. Ct. 722, 86 L.Ed. 971; Colorado-Wyoming Gas Co. v. Federal Power Comm., 1945, 324 U.S. 626, 65 S.Ct. 850, 89 L. Ed. 1235; Saginaw Broadcasting Co. v. Federal Communications Comm., 1938, 68 App.D.C. 282, 96 F.2d 554.

All estimates of probable traffic were based upon consideration of past and then-present traffic between Los Angeles and Denver and points east, expanded to fit the long-term secular-growth trend of air travel, and other factors. These factors varied among the applicants and their witnesses, but, as noted, all applicants forecast substantial profits. Western's estimate of the traffic was based upon a study of the average monthly traffic over the Los Angeles-Salt Lake City route for 45 months from January 1, 1940, to September, 1943, and that average was heavily weighted with the interchange operation, August, 1940, to May, 1942. Continental's traffic estimate was based upon a connecting service. United estimated that its traffic over the new route in the first post-war year of operation would be 3.4 times the traffic in 1940.

Western's testimony, not substantially controverted, was that if United had operated the new route in 1943, Western would have incurred an operating deficit of $435,772 from its whole system, instead of the operating profit of $183,170 which it did in fact earn, and that even with a 50 per cent increase in its other traffic, its deficit would have been between $350,000 and $400,000.

Any forecast of the result of a new venture contains a core of certainty and a margin of conjecture. If the venture is closely similar to established operations, the core is large and the margin small. If there is no experience data on major elements, the margin of conjecture is considerable. In the case at bar the route is new, the high-altitude service is new, and the preferences of travelers in future years is impossible to predict with dollar accuracy. Experienced commercial data upon DC-4 and Constellation operation is not available, and the estimates of its expenses were not by operators but by the manufacturers of the equipment.

It is frequently possible to make a forecast confined to the relatively certain and without venturing too far into the realm of conjecture. It is no novelty in the world of practical affairs for a business group to forecast economic desirability in a contemplated venture, without attempting to predict the results in terms of dollars. It could not be said that such a forecast in general terms is fatally defective merely because no one could predict with precision the probable net revenue in dollar amounts.

While, in the present case, a finding as to the dollar amount of the net revenue from the operation of the new route would have had a core of certainty, based upon experience in other operations, it would have contained also a considerable margin of conjecture. In making its findings, the Board obviously felt that within the core of certainty it could predict a profit and an economic desirability and could also predict in general terms serious injury to Western from a material diversion of traffic. It went no further; it did not venture the conjecture involved in a computation of the dollar probability. We think that the data in the record was ample to support the general findings which were made. In other words, we think the evidence ample to support a finding that operation by Western would be economically sound, and a finding that an award to United would be seriously injurious to Western.

■ The principal contention of United is that the findings are not sufficient to support the conclusion reached. It says that the award to Western is fatally defective because the Board made no findings as to the revenues to be derived and expenses to be incurred in the operation of the route by Western without an interchange agreement. The kernel of the contention is that the economic effect of an award to United cannot be told without a finding of Western's net revenue from a connecting service on the new route.

It is true that the Board made no findings of the revenues and expenses of Western in operating the new route upon a connecting-service basis. It specifically said that there was in the record no evidence of such revenues and expenses.

It is also true that in many cases it is necessary to make basic findings in dollars. For example, in fixing fares and charges for the future operation of a new service, both the companies and the regulatory authorities must make dollar estimates of probable revenues and expenses. There the thing to be determined is a dollar amount,

and the uncertainties involved do not remove the necessity for intelligent conjecture. The subject matter requires it. Since the dollar amounts of future fares are computed directly from the predicted revenues and expenses, those dollar amounts must be determined, even though the determination be a forecast subject to all the frailties of prophecy.

But two features of the present case lead us to hold that the findings, as made in general terms, are sufficient to support the award. The first feature is the nature of the final decision to which the case was reduced. In the early stages of its consideration, the Board made two determinations of policy. One was to establish the new route; the other was to maintain Western as a strong carrier. It next concluded, upon the record, to eliminate two of the four applicants. The remaining and final decision was a choice between the two remaining applicants. Obviously the choice was to be made in furtherance of the policies already established. Therefore, the question at that point was not whether an award to Western would be good or bad per se for Western. The question was which of the two awards was relatively better for Western. The decisive factors were not the individual merits of either award but the relative merits of the two. The Board found that one course, an award to United, definitely meant serious, if not disastrous, injury to Western. The other course meant the economically sound operation of Western. The contrast thus depicted was vivid. The question now before us is whether those two findings were sufficient foundation for a comparison between the two possible courses and for the exercise of a choice. We think they were.

If, in final analysis, the question in the case had been whether the establishment of the new route and its operation by Western would be beneficial for Western, a finding as to the probable revenues and expenses might well have been essential to a valid conclusion. But where, as here, the problem was to choose between two courses, valid findings that the one course would be economically sound but the other economically injurious, constitute, we think, sufficient foundation for the choice. Adverting again to practical affairs in the business world, we are sure that valid and proper decisions of choice are frequently made upon descriptive data in general terms, without precise computations, where the general data is well-founded and the contrast thus depicted is vivid. It would be idle to say that a valid choice between courses of action could not be made without precise predictions of the results of each course.

United contends that conceivably Western might lose more by the operation of the new route than it would lose by the complete loss of the traffic. The fallacy in the contention is that it must assume that the operation of the new route by Western would be at a net loss. We do not think such an assumption can be indulged in view of the Board's finding, based on substantial evidence, that the operation of the new route by any of the applicants, including Western, would be profitable.

The other feature of the case which impels us to hold that the findings are sufficient, is the general nature of the problem. The conclusion to be reached is not a figure, and the factors from which the conclusion must be fashioned under the statute are not dollar amounts. In large part they are imponderables. The economic and competitive desirability of the maintenance of Western was not measurable in dollars. Neither was the contrary competing consideration, the convenience of a large portion of the traveling public. There is no formula for combining these elements into a conclusion. Essentially, the selection of operators for new air routes is a task for administrative judgment. The findings which were made were basic findings upon the matters which led to the ultimate finding in the terms of the statute.[9] We think that the generalities in which the alternatives were depicted (being fully supported by the evidence) suffice in view of the nature of the final action involved. An attempt to compute the result in dollars

---

[9] Saginaw Broadcasting Co. v. Federal Communications Comm., 1938, 68 App.D.C. 282, 96 F.2d 554.

was not an indispensable prerequisite to the award in this case.

United argues throughout its petition and its brief that by virtue of the award to Western the public will have to get along with two-carrier connecting service; that more than 50,000 passengers will have to change planes at Denver; and that the consequence will be the imposition at Denver of the unheard-of inconvenience to which air travelers have been subjected at Salt Lake City. It says that even if traffic were diverted in the amount predicted, Western would still be larger than many other carriers; that the Board found in 1940 that Western was then financially self-sufficient, and Western has grown since then; and that the Board made no effort to demonstrate that Western would lose money in operating a smaller volume of business.

These arguments compel recollection of the general setting of the case. United is the second largest air carrier in the country. It has a transcontinental route, No. 1, which terminates at San Francisco and at Portland. Its plea is that it should be awarded another, a third, direct west-coast terminal. It also operates routes up and down the entire west coast, but it pleads for a direct entrance into Los Angeles. There are already available to the public two single-carrier through services from the east directly to Los Angeles. If the award were to United, only three cities east of Denver of more than 40,000 people which do not now have through service, would get it. The public whose convenience is involved is not the entire public, but that portion of the public which chooses to travel by United, and the number named are those who would choose to change planes. The "imposition" is not new or compulsory, and the inconvenience is not unheard-of but is the same inconvenience which has been undergone voluntarily at Salt Lake. That Western would remain solvent and larger than some companies, even if it lost the traffic as predicted, is unimpressive as a plea for an award of the new route to United. Competition to the extent necessary to assure the sound development of an adequate air-transportation system is specified by the Act as one of the elements of the public interest. The Board did not rely upon these considerations, but they are of importance because United asserts the compelling force of the arguments mentioned.

United also says that the Board failed to pass upon issues presented by it relating to various phases of an interchange service. If the actualities of interchange service were essential elements to the Board's conclusion upon the ultimate question before it, a remand upon the point would have been proper. As our opinion indicates, we are not of that view.

Affirmed.