444 F.2d 969
 TEXAS INTERNATIONAL AIRLINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent,
American Airlines, Inc., et al., Intervenors,
Southern Airways, Inc. and Beaumont, Texas Chamber of Commerce, et al., Intervenors.
TEXAS INTERNATIONAL AIRLINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent,
Delta Air Lines Inc., et al., Intervenors.
The CITIES OF TEXARKANA, TEXAS AND TEXARKANA, ARKANSAS, et al., Petitioners,
v.
CIVIL AERONAUTICS BOARD, Respondent,
Delta Air Lines, and Southern Airways, Inc., Intervenors.
 No. 23232.
 No. 23233.
 No. 23481.
 No. 23482.
 United States Court of Appeals, District of Columbia Circuit.
 Argued June 25, 1970.
 Decided April 30, 1971.
 Petition for Rehearing in Nos. 23481, 23482 Denied June 2, 1971.
 
 Mr. James M. Verner, Washington, D. C., with whom Messrs. Ronald B. Natalie, and William C. Evans, Washington, D. C., were on the brief, for petitioner in Nos. 23,232 and 23,233.
 Mr. Paul Reiber, Washington, D. C., with whom Mr. Julius Schlezinger, Washington, D. C., was on the brief, for petitioners in Nos. 23,481 and 23,482.
 Mr. Frederick D. Houghteling, Attorney, Civil Aeronautics Board, with whom Messrs. Joseph B. Goldman, General Counsel, Civil Aeronautics Board at the time the brief was filed, O. D. Ozment, Deputy General Counsel, Warren L. Sharfman, Associate General Counsel Litigation and Research, Robert L. Toomey and James E. Keough, Attorneys, Civil Aeronautics Board, and Howard E. Shapiro, Attorney, Department of Justice, were on the brief, for respondent. Mr. R. Tenney Johnson, General Counsel, Civil Aeronautics Board, also entered an appearance for respondent in No. 23,482.
 Mr. J. William Doolittle, Washington, D. C., with whom Mr. Alfred V. J. Prather, Washington, D. C., was on the brief, for intervenor, American Airlines Inc., in No. 23,232.
 Mr. Robert J. Corber, Washington, D. C., with whom Mr. Richard A. Fitzgerald was on the brief, for intervenor, Frontier Airlines Inc., in Nos. 23,232 and 23,233.
 Mr. Cecil A. Beasley, Jr., Washington, D. C., with whom Messrs. John Law Elliott and John C. Smuck, Washington, D. C., were on the brief, for intervenor, Southern Airways, Inc.
 Mr. Maurice D. Dyer, Little Rock, Ark., was on the brief for intervenors, City of Little Rock, Arkansas, Little Rock Municipal Airport Commission and Little Rock Chamber of Commerce.
 Mr. Richard H. Wootton, Hot Springs, Ark., was on the brief for intervenors, City of Hot Springs, Arkansas, and the Hot Springs Chamber of Commerce in No. 23,233.
 Messrs. Robert Reed Gray, Washington, D. C., R. S. Maurer, Atlanta, Ga., and Jame W. Callison, Atlanta Airport, entered appearances for intervenor, Delta Air Lines, in Nos. 23,232, and 23,233.
 Before WILBUR K. MILLER, Senior Circuit Judge, ROBB, Circuit Judge, and DAVIS,* Judge, United States Court of Claims.
 PER CURIAM:
 
 
 1
 These cases are consolidated petitions under 49 U.S.C. § 1486 (1964), to review decisions of the Civil Aeronautics Board in two new route cases known as Central Airlines, Inc., Route 81 Investigation (Central 81 case) and the Gulf States-Midwest Points Investigation (Gulf States). The petitioners are Texas International Airlines[1] (Texas International) and the cities of Texarkana (Texas and Arkansas), the Texarkana Airport Board and the Texarkana Chamber of Commerce, collectively referred to as Texarkana. Intervenors include Southern Airways, Inc., Frontier Airlines, Inc.,[2] American Airlines, Inc., and the cities of Little Rock, Hot Springs and Beaumont. Texas International's petition in No. 23,232 relates to the Gulf States decision, and its petition in No. 23,233, to the Central 81 decision. Texarkana's petition in No. 23,481 challenges the Central 81 decision and its petition in No. 23,482 challenges the Gulf States decision. Little Rock, Hot Springs and Beaumont complain of the Board's failure to grant them certain improved service.
 
 
 2
 The large number of routes and proposed routes considered by the Board in its proceedings, and the multitude of parties and intervenors who participated, produced a record of unusual length and complexity. The joint appendix distilled from the record by the parties and filed in this court consists of 671 pages. There are 359 pages of briefs. After studying all of this material we have concluded that the statement of the case in the Board's brief presents a fair summary of the proceedings before the Board and of the pertinent facts; accordingly, we shall follow this summary in our statement of the cases.
 
 I.
 
 3
 The Central 81 case was designed primarily to examine local service needs in the southwest, and granting the applications of Texas International in that case would, in connection with the carrier's existing route structure, have permitted service between Houston and St. Louis via Memphis and intermediate points other than Memphis.
 
 
 4
 The Gulf States case was designed to examine long haul service needs, and the Texas International applications in that case likewise were for service between Houston and St. Louis either directly or via Memphis as well as service from New Orleans via Memphis to St. Louis and Chicago and between any combination of these points.
 
 
 5
 Texas International here challenges the Board's actions insofar as they denied its applications and granted American Airlines (American) a Houston-St. Louis route and Southern Airways (Southern) routes between Memphis-St. Louis and Memphis-Chicago. Texarkana's complaints are the same in both cases, namely, that the Board should have authorized Texarkana-St. Louis service in addition to other services to Texarkana which were authorized.
 
 
 The Central 81 Case
 
 
 6
 The Central 81 case was instituted by the Board in May 1965 (Order E-22227) for the purpose of restructuring Central Airlines' Route 81 in an effort to eliminate uneconomic segments and points, and to realign the route so as to give the carrier access to a greater volume of traffic, reduce subsidy, and provide more convenient service to the traveling public.[3] As a result of various orders expanding the issues, the proceeding was converted into a vehicle for "reappraisal of much of the local service needs in the southwest area".
 
 
 7
 The issue pertinent to this case was whether the public convenience and necessity required additional service between Memphis and St. Louis, a market in which Delta Airlines was then the only carrier, and, if so, who should provide it. When the Board converted the case into a local service area proceeding, it consolidated several applications by Texas International for new authority (Order E-23158). Grant of these applications would have made possible not only Memphis-St. Louis service by Texas International, but, by reason of Texas International's existing authority, nonstop and one-stop service between Houston and St. Louis, either via Memphis or via other gateways by-passing Memphis,[4] and between New Orleans and St. Louis, via Little Rock or Jonesboro.[5]
 
 
 8
 Southern sought consolidation in this case of several applications relating to Memphis-St. Louis service. The first (Docket 17142), extending its existing New Orleans-Memphis segments would have made possible a one-stop St. Louis-New Orleans service. The second docket (17141) seeking a new segment between Memphis and St. Louis would have made possible a two-stop service.[6] By order E-23686, the Board denied consolidation of the first of Southern's applications on the ground that it did not desire to consider additional usable St. Louis-New Orleans service in this proceeding; however, the Board consolidated Southern's second application, to permit two-stop St. Louis-New Orleans service. In the same order, the Board put Texas International on an equal footing with Southern by imposing a pretrial restriction, requiring Texas International to make two intermediate stops on any St. Louis-New Orleans service it might operate under a grant of its previously consolidated applications.
 
 
 9
 Also consolidated into the Central 81 case was a petition by Texarkana for local airline service over a number of routings (Docket 16366). Among the routes sought by Texarkana were (1) Texarkana-Houston via Shreveport; (2) Texarkana-New Orleans via Shreveport; and Texarkana-St. Louis via several alternate routings including a Hot Springs, Little Rock, Jonesboro, routing.[7]
 
 
 10
 After evidentiary hearings, the examiner issued his initial decision in the Central 81 case on April 12, 1968. With respect to Memphis-St. Louis authority, he found that additional service between these points was required and that a local service carrier should be selected because of the reduction in subsidy need which the service would be likely to produce. (Initial Decision (I.D.) pp. 21-22). In selecting among the local service applicants, the examiner stated that he was unable to evaluate Texas International's application for operations over this segment since it had failed to submit plans or estimates for a St. Louis extension from Memphis only; rather, its proposal consisted of an integrated package of plans, revenues, cost, etc., for a Houston-St. Louis service not only via Memphis but also via Little Rock and Jonesboro. Consequently, the examiner denied Texas International's application for this single segment. Considering that segment alone the examiner found that Ozark rather than Southern should be selected.[8] His choice was based upon findings that Ozark's operation of the route would produce an operating profit of $471,000 and a subsidy need reduction of $202,000 (as opposed to an operating profit of $397,000 for Southern, and a subsidy need reduction of $69,000), and that Ozark would provide greater benefits in terms of new single-plane service (I.D., p. 23).[9]
 
 
 11
 Turning to Texas International's applications for new Houston services, the examiner rejected them. He found that Texas International could operate the route "at a profit of $140,000" if it were the only carrier to obtain the Memphis-St. Louis segment, but that it would be a loss operation with Ozark operating a nonstop service in the latter market as he recommended (I.D., p. 29).[10] Moreover, he found the subsidy need reduction which Ozark would achieve from a Memphis-St. Louis award was substantially greater than Texas International would achieve under its proposal for the St. Louis-Houston route. He found also that Texas International's proposals would divert substantial revenues from Frontier in the Hot Springs-St. Louis market and that its extension to St. Louis would not provide substantial public benefits to beyond-segment traffic, i. e., beyond Memphis-St. Louis.[11] In addition he found that there was no need for additional service between Little Rock and St. Louis, which received nonstop service by Delta (I.D., p. 25).
 
 
 12
 Coming to Texarkana's application for direct service to St. Louis, Houston, New Orleans, Tulsa, Oklahoma City, and Kansas City, the examiner recognized Texarkana's contention that the inconvenient service it received was responsible for the cities' poor traffic-generating showing.[12] Nevertheless it was the examiner's judgment that there was an insufficient traffic potential to support all of the service requested without a substantial increase in subsidy, and that the subsidy which would be required could not be justified by the amount of traffic to be benefited (I.D., p. 30). Nevertheless, he found that Texarkana's air services could be greatly improved at little cost by closing the Texarkana-Shreveport gap and authorizing a Shreveport-Houston segment, and he so recommended.
 
 
 13
 The Board granted limited discretionary review of the examiner's initial decision (Order 68-8-96). The issue pertinent to this case which the Board reviewed was the selection of a carrier for the Memphis-St. Louis route.
 
 
 The Gulf States Case
 
 
 14
 Several months after the scope of the Central 81 case had been established, the Board instituted the Gulf States case (Order E-24202, as amended by Order E-24882). The purpose of that investigation was to consider whether the public convenience and necessity required additional or first nonstop or one-stop service in ten important markets, including Houston-St. Louis, Memphis-Chicago, New Orleans-Memphis and New Orleans-Chicago.[13] The Board stated that it would consider inclusion of intermediate points on any of the segments at issue, provided only that any flight operated pursuant to an award in the case must serve both terminals and no more than one intermediate point between the terminals (Orders E-24882, E-25180). However, the Board also specified that a single flight could serve more than one primary market.
 
 
 15
 Dozens of applications were consolidated for consideration in the case. Among these were applications by Texas International for (1) the Chicago-New Orleans segment, with St. Louis as an intermediate point; (2) Chicago-Memphis, with St. Louis as an intermediate; and (3) New Orleans-Memphis. In addition, a petition by Texarkana was consolidated, requesting, among other things, direct service to St. Louis.
 
 
 16
 A little more than three months after issuance of the initial decision in the Central 81 case and just prior to the Board's grant of limited review of that decision, the examiner issued his initial decision in the Gulf States case. Only pertinent portions are discussed here.
 
 
 17
 After a detailed review of traffic, service, and economic characteristics of the Chicago-New Orleans market (I.D., pp. 5-7, 47-49, App. B., pp. 7-8), the examiner concluded that this market needed additional service (I.D., p. 48). Upon consideration of possible intermediate points,[14] he found that St. Louis should be named as an intermediate point on the route because of the need for additional service between that point and New Orleans (I.D., pp. 49-50).[15] He concluded that Eastern should receive a Chicago-New Orleans segment via St. Louis.[16]
 
 
 18
 Although he found that the Chicago-Memphis market required additional service, the examiner concluded that no intermediate points should be included on the route. Southern was selected to operate the route. In the final analysis, the examiner's choice rested upon beyond benefits and subsidy need reduction. Looking solely at the local traffic, he found that none of the local service carriers could achieve significant subsidy need reduction (I.D., p. 70). However, he found that each could to some extent rely upon back-up traffic support, which should produce enough additional revenue to produce subsidy reduction (I.D., pp. 71-72). Of the four local service carriers, Southern was found to have the most significant back-up potential and to "offer the best possibility for subsidy reduction." (I.D., p. 73, A. 455). Moreover, the examiner emphasized that of the local carrier applicants, Southern had the greatest need for route strengthening and subsidy reduction, since it derived a higher percentage of its revenue from subsidy than any of the others.[17]
 
 
 19
 Southern was also picked by the examiner to operate the New Orleans-Memphis route. He based this selection on Southern's historic participation in the traffic over the route, the adverse impact on its revenues and normal development if the award were made to another carrier, and the back-up it would give to the Memphis-Chicago service being awarded to Southern. The examiner found that the facts did not favor the selection of Texas International, and Texas International abandoned its application when the case reached the Board for review.
 
 
 20
 Having first concluded that the Houston-St. Louis market required new service, the examiner considered the question of intermediate points. Among those found to be within acceptable circuity limitations were Memphis, Shreveport, Little Rock, Texarkana, and Beaumont/Port Arthur (I.D., p. 44). Texarkana and Beaumont/Port Arthur, the examiner found "obviously lack the traffic potential to support a stop * * *"; and he found that Little Rock's "Houston potential falls considerably short of requiring and supporting a competitive nonstop service." (I.D., p. 115.)[18] The examiner eliminated the others because they already had sufficient service to the terminals or had been recommended for additional service in the Central 81 case. Accordingly, the examiner found that the Houston-St. Louis segment should include no intermediate points (I.D., p. 116).
 
 
 21
 In making his carrier selection, the examiner noted that the local service carriers had all estimated a subsidy need reduction, but that this had been predicated upon the carriage of many intermediate market passengers (I.D., p. 116). In view of his determination not to include any intermediate points, the examiner found that the local service carriers' forecasts "have no validity" and he concluded that all of them would incur an increase in subsidy need if they operated the route on a nonstop basis (I.D., p. 117, and App. E, p. 6).
 
 
 22
 The examiner recognized that Texas International (and Ozark) would have some backup support. Texas International's backup support, however, was largely dependent upon San Antonio-St. Louis traffic which at the time had no single-carrier service; but the examiner had already determined to include St. Louis as an intermediate in the San Antonio-Chicago market, thereby making possible nonstop San Antonio-St. Louis service, and he had awarded that route to American. Accordingly, it was his judgment that a one-stop service by Texas International via Houston would not capture sufficient traffic to alter materially his estimates relating to the subsidy implications of the Houston-St. Louis route. Ultimately, the examiner narrowed the choice to TWA and American and selected TWA because of its superior beyond segment benefits.
 
 
 23
 On August 14, 1968 (4 days before grant of limited discretionary review in the Central 81 case), the Board sua sponte ordered discretionary review of the initial decision in the Gulf States case (Order 68-8-62).
 
 
 The Board's Decisions
 
 
 24
 On May 7, 1969, the Board issued its decision in the Gulf States case (Order 69-5-25), and on September 3, 1969, it issued a further opinion and order on reconsideration (Order 69-9-18). Taken together, the decisions made a number of changes in the initial decision of the examiner, which the Board otherwise adopted. The result pertinent to this case was that the Board (1) changed the New Orleans-Chicago award to Eastern by eliminating St. Louis as an intermediate point; (2) selected American rather than TWA for the Houston-St. Louis award; and (3) affirmed the Chicago-Memphis award to Southern on reconsideration although it had given the route to Eastern in its original decision.
 
 
 25
 The Board disagreed with the examiner as to the intermediate points to be included in the Chicago-New Orleans route awarded to Eastern. Among other things, it concluded that St. Louis should not be named as an intermediate point. It pointed out in this connection that after the initial decision had been issued, Ozark had been awarded Chicago-St. Louis nonstop authority in another proceeding. Thus, including St. Louis in the Chicago-New Orleans award to Eastern would have placed a fourth carrier in the Chicago-St. Louis market. "Not only," the Board said, "is this market not ready for a fourth nonstop carrier, but we are not inclined to make such an award on top of our recent subsidy-ineligible grant of nonstop authority to Ozark in this market" (Order 69-5-25, p. 9).
 
 
 26
 The Board's selection of American instead of TWA in the Houston-St. Louis market need not be reviewed. It suffices to say that the Board found "that none of the local service carriers should be selected for this route because it is improbable that any of them could achieve a subsidy reduction and because of the limited beyond benefits they could offer." (Order 69-5-25, p. 31, p. 49).
 
 
 27
 In affirming the examiner's selection of Southern for the Memphis-Chicago route, thus reversing its own earlier determination, the Board relied on such factors as changed equipment conditions affecting the costing of flights south of Memphis, fare increases, a revised judgment as to the carrier's ability to penetrate the market, and adjustments to revenues to reflect on-line connecting traffic to points south of Memphis not proposed for single-plane service, which had not been included in earlier estimates. The Board concluded (Order 69-9-18, p. 8):
 
 
 28
 "that Southern will indeed be able to compete effectively with Delta in the Chicago-Memphis market, and that the award will materially strengthen the carrier and contribute to reducing its dependence on federal subsidy. Since it now appears that Southern can operate its schedule proposal profitably, it becomes in order to point out that Southern's proposal offers considerably greater public benefits than Eastern's, in terms both of schedules operated in the local market and of beyond-segment passengers benefited. Thus, the balance of the relevant factors now weighs in favor of an award to Southern rather than Eastern."
 
 
 29
 At the same time the Board denied Texas International's petition for reconsideration with respect to this route on the grounds that its beyond-segment traffic potential was less than Southern's, its need for strengthening was less, and its service proposals did not outweigh the factors favoring selection of Southern. (I.D., p. 9).
 
 
 30
 The day following decision of the Gulf States case, the Board decided the Central 81 case (Order 69-5-30).[19] Only its disposition of the carrier selection issue in the Memphis-St. Louis market is relevant here. The Board selected Southern for the route award instead of Ozark, which had been selected by the examiner.
 
 
 31
 Since the examiner had narrowed the choice to Southern and Ozark, the Board first took up those two carriers, and concluded that Southern should be preferred over Ozark. Although the examiner had found Ozark superior in terms of traffic which would receive single-plane service, based on 1966 traffic data, the Board found that a fairer test would be the number of passengers who would receive such service in the forecast year, 1968. On this basis, the examiner's figures showed that Ozark's margin shrank to 558 passengers, a figure devoid of decisional significance in the Board's judgment (Order 69-5-30, p. 3). Conversely, the Board said, the examiner's figures showed Southern serving the convenience of a substantially greater number of beyond-segment passengers than Ozark in all markets. The Board also pointed out that because Southern could tack the Memphis-New Orleans authority which it had received in the Gulf States case with the Memphis-St. Louis segment, Southern's ability to serve the convenience of beyond traffic would be further enhanced, since it could thereby provide one-stop St. Louis-New Orleans service (I.D., p. 4).[20]
 
 
 32
 The Board also found that both Ozark and Southern could achieve significant subsidy need reductions from the Memphis-St. Louis award. By making unchallenged adjustments to the examiner's finding of a $69,000 reduction for Southern, the Board estimated that Southern's reduction would be in the neighborhood of $172,000 without taking into account the benefits of the St. Louis-New Orleans service. The result, the Board said, was so close to the various estimates for Ozark that the difference was not sufficient to outweigh the other factors favoring Southern over Ozark. Chief among these factors in addition to beyond benefits, was Southern's greater need for strengthening.[21] Finally, the Board concluded that "St. Louis will be a far stronger anchor for the northwest corner of Southern's system than Memphis, whereas the addition of Memphis to Ozark's system would not result in comparable structural strengthening." (Order 69-5-30, p. 6.)
 
 
 33
 Having decided that Southern should be preferred over Ozark, the Board then turned to a comparison of Southern and Texas International and Frontier. The Board found it "clear" that the latter two could not achieve a subsidy need reduction comparable to Southern (or Ozark) since their claimed beyond-segment benefits were of little significance: "As these carriers could bring relatively little improved service to beyond-segment markets, so they could achieve relatively little back-up support for prime-market service." (Order 69-5-30, pp. 7-8.)
 
 II.
 
 34
 In the Central 81 case Texas International filed an application to operate nonstop and one-stop service between New Orleans and St. Louis. Southern likewise applied for authority to operate one-stop service between New Orleans and St. Louis. Texas International's application was consolidated in the Central 81 case but the Board refused to consolidate Southern's application. The ground of the Board's refusal was that consideration of nonstop and one-stop service between New Orleans and St. Louis would unduly expand the proceeding. The Board did agree to consider an application by Southern which would permit two-stop St. Louis-New Orleans service; and in order to put Texas International on an equal footing with Southern, the Board imposed a pretrial restriction which required Texas International to make two stops on any St. Louis-New Orleans service which it might be authorized to operate.[22]
 
 
 35
 As we have said, Southern received Memphis-New Orleans nonstop authority in the Gulf States case; and in the Central 81 case Southern was awarded Memphis-St. Louis authority. The examiner had selected Ozark for the Memphis-St. Louis route. The Board, however, concluded that the public convenience and necessity required that Southern be selected instead of Ozark. In comparing Southern with Ozark in the Central 81 case the Board said (Order 69-5-30, pp. 3-5, footnotes omitted):
 
 
 36
 "We find that Southern would offer somewhat superior service benefits, and that, even though Ozark might achieve a slightly greater subsidy need reduction than Southern, an award in this market offers a more significant opportunity for strengthening Southern than it does for Ozark.
 
 
 37
 "The examiner showed Ozark as affording first single-plane service to more than twice as many passengers as Southern (9,945 vs. 4,510), based on 1966 traffic data. We agree with Southern, however, that a fairer test is the number of passengers who will be afforded first single-plane service in the forecast year (here 1968). On this basis, and counting only those passengers who would actually use the carrier's service, Ozark's advantage over Southern shrinks to a mere 558 passengers (12,909 vs. 12,351) — a margin devoid of decisional significance since it is obviously less than the probable error in the forecasts.
 
 
 38
 "On the other hand, the examiner's figures show Southern conveniencing a substantially greater number of beyond-segment passengers in all markets than Ozark (30,523 vs. 18,105). Moreover, recent route awards have enhanced Southern's ability to offer significant beyond-segment service benefits more than they have Ozark's. In particular, Southern's recent award of Memphis-New Orleans nonstop authority in the Gulf States-Midwest Points Service Investigation, Order 69-5-25, May 7, 1969, opens up the possibility of one-stop service in the St. Louis-New Orleans market. The examiner in Gulf States forecast 60,000 passengers in this market by 1969, and found that `competition is needed as a spur to improve existing services which are something less than attractive.' (Gulf States, I.D., p. 50)
 
 
 39
 "While we did not follow the examiner's recommendation in Gulf States to include St. Louis as an intermediate point on a new Chicago-New Orleans segment, for reasons explained in our decision there relating to the St. Louis-Chicago market, we nevertheless did not question his findings with respect to need for additional service in the St. Louis-New Orleans market. With one-stop authority in this market via Memphis, at virtually no circuity, Southern should be able to participate in the traffic to a substantially greater extent than Eastern, and should provide a valuable competitive spur to Delta.
 
 
 40
 "Ozark does not offer any comparable competitive service benefits."
 
 
 41
 Texas International contends strenuously that the Board's disposition of its application for New Orleans-St. Louis authority violated the doctrine of Ashbacker Radio Corp. v. F. C. C., 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). The argument is that although the Board refused to consider the issue of nonstop or one-stop New Orleans-St. Louis service in the Central 81 case, and the parties proceeded on that basis, nevertheless in the Central 81 case the Board found that Southern's ability to provide one-stop service via Memphis between New Orleans and St. Louis was a factor favoring the award of the Memphis-St. Louis route to Southern. Texas International concludes that these actions by the Board denied Texas International a comparative consideration of its application for New Orleans-St. Louis authority.
 
 
 42
 We think the Board did not violate the Ashbacker doctrine. In the first place, Texas International's application was denied on grounds unrelated to Southern's ability to combine its Memphis-New Orleans authority with the Memphis-St. Louis grant. Southern's ability to combine or "tack" the two authorities was mentioned by the Board only as one factor favoring a grant to Southern rather than to Ozark; it had nothing to do with the denial of Texas International's application. Moreover, in the Gulf States case the Board did consider the issue of nonstop or one-stop service between New Orleans and St. Louis, and in that case Texas International proposed nonstop service between these points. Southern proposed both nonstop service and one-stop service via Memphis, and Texas International also applied for Memphis-New Orleans authority. It thus appears that Texas International's proposals for New Orleans-St. Louis service were comparatively considered in the Gulf States case.
 
 
 43
 Southern's ability to combine its two grants did not result in unfairness to Texas International. Such tacking is not a new device. See Frontier Airlines, Inc. v. CAB, 104 U.S.App.D.C. 78, 259 F.2d 808 (1958). Had Texas International received New Orleans-Memphis authority in the Gulf States case it too might have relied upon this authority as a ground for its selection in the Central 81 case.
 
 
 44
 In support of its argument that it was denied a comparative hearing Texas International relies upon Delta Air Lines, Inc. v. CAB, 107 U.S.App.D.C. 174, 275 F.2d 632 (1959), cert. denied, Trans World Airlines v. Delta Air Lines, Inc., 362 U.S. 969, 80 S.Ct. 953, 4 L.Ed.2d 900 (1960). We think that case must be distinguished on the facts, for there the Board excluded from consideration in one proceeding issues that remained pending unheard in another proceeding, and the Board in the first proceeding made an award which in effect determined those unheard issues. Here no proposals were unheard; on the contrary all of the issues were litigated.
 
 
 45
 In general, the other attacks on the Board's orders by the complaining parties are based upon challenges to the judgment and computations of the Board and the examiners with respect to such matters as beyond-segment revenues and service, costs, the possibility of subsidy need reduction, convenience to passengers, route patterns, and the public interest. In reviewing these contentions we are mindful of our limited function. The selection of operators for new air routes is a task for administrative judgment. United Air Lines, Inc. v. CAB, 81 U.S.App.D.C. 89, 155 F.2d 169 (1946). The selection cannot be made by the application of a mathematical formula; the Board in the exercise of its judgment must consider and evaluate all pertinent factors. North Central Airlines, Inc. v. CAB, 105 U.S.App.D.C. 207, 265 F.2d 581, cert. denied, 360 U.S. 903, 79 S.Ct. 1285, 3 L.Ed.2d 1254 (1959); Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 379 F.2d 453 (1967). The Board's findings of fact, if supported by substantial evidence, are conclusive on us. 49 U.S.C. § 1486(e). If examination of the entire record discloses that the Board's findings are supported by substantial evidence and that its conclusions flow rationally from such findings, it is not for us to substitute our judgment for the judgment of the Board. Lake Central Airlines, Inc. v. CAB, 99 U.S.App.D.C. 226, 239 F.2d 46 (1956); Frontier Airlines, Inc. v. CAB, 104 U.S.App.D.C. 78, 259 F.2d 808 (1958); Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 379 F.2d 453 (1967). Evaluation of the uncertainties and imponderables implicit in economic and competitive factors is a task for the Board, not for this court. United Air Lines, Inc. v. CAB, 81 U.S.App.D.C. 89, 155 F.2d 169 (1946).
 
 
 46
 Considering the record in the light of these principles we are satisfied that the Board's findings are supported by substantial evidence and that its resulting conclusions are rational. Recapitulation of the complex details of the evidence would serve no useful purpose and would make this opinion intolerably long; it is enough to say that we cannot find that the Board's conclusions were in any respect unreasonable. One matter, however, does merit further consideration.
 
 
 47
 Texas International contends that the award of a Memphis-St. Louis route to Southern is in error because in computing the subsidy need reduction that Texas International might achieve the examiner in the Central 81 case erroneously applied Southern's DC-9 block hour cost to Texas International. According to Texas International if its block hour cost had been used its subsidy need reduction would have been $280,000 rather than $140,000 as found by the examiner, and would have exceeded the subsidy need reductions attributed to both Ozark and Southern. Texas International argues further that although this alleged error was called to the attention of the Board it was perpetuated in the Board's ultimate finding that Texas International could not achieve a subsidy need reduction comparable to those found for Ozark and Southern. We are not persuaded by this argument.
 
 
 48
 In rejecting Texas International's application for Memphis-St. Louis authority the examiner in the Central 81 case did not rely upon the factor of subsidy need reduction. Rather, he based his decision upon the ground that Texas International had not submitted plans and estimates for a St. Louis-Memphis extension but for a Houston-St. Louis service with the St. Louis entry via Little Rock, Jonesboro and Memphis. Accordingly, he found (I.D., p. 22):
 
 
 49
 "Without specific plans and estimates for the Memphis-St. Louis extension, it is impossible to determine the merits of its Memphis-St. Louis proposal only. Its application for a Memphis-St. Louis extension should be denied."
 
 
 50
 The examiner's estimate of $140,000 as the subsidy need reduction that might be achieved by Texas International was made with respect to a different proposal, namely, Texas International's proposal for a "St. Louis-Houston route by the extension of its system north from Jonesboro, Little Rock, and Memphis to St. Louis and south from Texarkana to Houston via Shreveport." (I.D., p. 28).[23] The examiner rejected this application. In its order granting discretionary review of the examiner's decision the Board declined to review his denial of Texas International's application for a Houston-St. Louis route via Jonesboro (Order 68-8-96, p. 2, n. 2). Accordingly, as the Board noted in its order denying petitions for reconsideration, that application and the forecasts relating to it were no longer in issue before the Board (Order 69-7-170, p. 2, n. 5). Moreover, the Board's finding in its decision that Texas International could not achieve a subsidy need reduction comparable to those found for Ozark and Southern was not based upon a computation of unit DC-9 costs. On the contrary, the Board pointed out that Texas International's case on this issue was based "primarily on claimed beyond-segment service benefits"; and after analyzing this claim the Board found that such benefits were of little significance (Order 69-5-30, pp. 6-7).
 
 
 51
 Upon consideration of the entire record the orders under review are
 
 
 52
 Affirmed.
 
 
 
 Notes:
 
 
 *
 Sitting by designation pursuant to Title 28 U.S.Code, Section 293(a)
 
 
 [1]
 Until September, 1968, this carrier's name was Trans-Texas Airways
 
 
 [2]
 As of September 1, 1967, Central Airlines, Inc., was merged with Frontier Airlines, Inc. Other intervenors are Delta Air Lines, Inc., and Southern Airways, Inc. Also intervening were the city of Little Rock, Arkansas, the Little Rock Chamber of Commerce, the city and Chamber of Commerce of Jonesboro, Arkansas; the city and Chamber of Commerce of Hot Springs, Arkansas; and the Beaumont, Texas Chamber of Commerce, the Port Arthur, Texas Chamber of Commerce, and the Commissioners Court of Jefferson County, Texas
 
 
 [3]
 A local service carrier, Central's route system was concentrated largely in the southwestern area of the country. At the time the proceeding was instituted, it was by almost every economic index the weakest of the nation's local service carriers and its subsidy requirements had been continually and substantially increasing (Order E-22227). The proceeding was instituted at the carrier's own petition. During the pendency of the proceeding Central was merged into Frontier Airlines, one of the nation's largest local service carriers. Frontier-Central Merger, Docket 18517, Order E-25626 (September 1, 1967)
 
 
 [4]
 The other gateways were Little Rock or Jonesboro. Texas International could also have operated nonstop between Houston and St. Louis, as well as between San Antonio and St. Louis, and Dallas and St. Louis. By a subsequent order (E-23935), the Board imposed a pretrial restriction under which any service authorized in these three markets would be required to make one intermediate stop
 
 
 [5]
 Texas International's certificate contained a restriction requiring three intermediate stops on flights between New Orleans and Memphis. As a result, any service between New Orleans and St. Louis operatedvia Memphis would have involved four intermediate stops. However, by by-passing Memphis, and utilizing instead Little Rock or Jonesboro as the gateway to St. Louis, a one-stop New Orleans-St. Louis service would have been possible. Indeed, all three gateways could have been overflown and a non-stop New Orleans-St. Louis service provided.
 
 
 [6]
 Southern was at that time authorized to operate a one-stop service between Memphis and New Orleans. If the segment were extended to St. Louis, it could overfly Memphis and thus provide one-stop (or even nonstop) St. Louis-New Orleans service. In contrast if Memphis-St. Louis authority were granted in the form of a separate segment, a St. Louis-New Orleans flight would be required to stop at the junction point of the two segments — Memphis — and also, because of the existing one-stop restriction, at one intermediate point between Memphis and New Orleans
 
 
 [7]
 At the time Texas International held authority to serve both Texarkana and Shreveport, but each city lay on different segments and, though they are separated by only 72 miles, direct service between them was not authorized
 
 
 [8]
 Frontier Airlines had been eliminated for reasons not here pertinent
 
 
 [9]
 The local service carriers' operations are supported by federal subsidy which is designed not only to cover actual operating costs, but also to insure that they earn an appropriate return on investment and taxes thereon. Sometimes operation of a given route will produce anoperating profit, but not enough to produce the appropriate return. In such cases, operation of the route is said to increase the subsidy need. In other cases, the operation of a given route will result in an operating profit which exceeds the appropriate return on investment devoted to that particular operation. The excess is thus available to reduce the amount of subsidy necessary to support the carrier's system-wide operations, and is usually referred to as a reduction in subsidy need.
 
 
 [10]
 Texas International is correct in stating that the term "profit" is more accurately to be referred to as a decrease in subsidy need. See Texas International's brief p. 35, n. 1, and note 9,supra.
 
 
 [11]
 In this connection, he noted that Houston-St. Louis received nonstop service from Delta, which was supplemented by connecting service throughout the day. He also found that San Antonio (which was an intermediate point on segment 3, one of the three segments which Texas International sought to have extended from Memphis to St. Louis) had frequent connecting service to St. Louis and hence that Texas International's multi-stop San Antonio-St. Louis proposals offered no important benefits
 
 
 [12]
 To illustrate, Texarkana's traffic to Houston in 1966 was 710, and to New Orleans 160 (I.D., App. 19). As the examiner pointed out, Texarkana had formerly received service to New Orleans, Tulsa, and Kansas City via Braniff, but the authority was terminated in 1963 when the city was generating only three passengers per day on a daily round trip (I.D., p. 30)
 
 
 [13]
 The other six markets were Dallas/Ft. Worth-Kansas City; Dallas/Ft. Worth-St. Louis; Dallas/Ft. Worth-Detroit; San Antonio-Chicago; San Antonio-Detroit; and Nashville-Chicago
 
 
 [14]
 The examiner found four points that would benefit the route and benefit from the route. Texarkana was one of the intermediate points proposed. However, a terminal-to-terminal routing via that point would have resulted in 21.4 percent circuity which the examiner found would be ineffectual in attracting primary market traffic (I.D., p. 7)
 
 
 [15]
 As previously indicated, Texas International, among others, proposed St. Louis as an intermediate
 
 
 [16]
 With respects to the local service carriers, including Texas International, the examiner found it "highly improbable" that they could mount a full pattern of competitive service without incurring operating losses and resultant increases in subsidy need. (I.D., p. 57.)
 
 
 [17]
 For the fiscal year ended June 30, 1967, subsidy accounted for 19.3 percent of Southern's total revenues, as opposed to 14.1 percent and 15.9 percent for Ozark and Texas International, respectively (I.D., p. 73)
 
 
 [18]
 1966 traffic between Texarkana and St. Louis was 390 and 710 between Texarkana and Houston. The comparable figures for Beaumont/Port Arthur were 800 and 33,720, respectively
 
 
 [19]
 Petitions for reconsideration were filed in this case, but the Board found no showing of error or new matter warranting a change in its decision (Order 69-7-170)
 
 
 [20]
 The Board emphasized that its refusal to place St. Louis on the Chicago-New Orleans segment in theGulf States case had in no way derogated from the examiner's finding in that case, adopted by the Board, that there was a need for additional St. Louis-New Orleans service. Rather, the Board said, that determination had rested upon special circumstances, i. e., the recent award of Chicago-St. Louis authority in another case.
 
 
 [21]
 Southern's total revenues, the Board found, were considerably less than Ozark's, and its dependence on subsidy much greater. In fiscal 1968, subsidy accounted for 15.5 percent of Southern's revenues, as opposed to 9.3 percent for Ozark
 
 
 [22]
 The Board's order in this respect was as follows:
 "Southern's application, docket 17142, involves the extension of Southern's existing segments 3 and 4 beyond Memphis to St. Louis. The grant of that application would authorize a one-stop St. Louis-New Orleans service with relatively little circuity. Although Central is an applicant for one-stop St. Louis-New Orleans authority, the routing is so circuitous that the service would not be usable. Under these circumstances, we find no justification for consolidating Southern's application.[4]
 "4. We note in this same connection that Trans-Texas' proposals for St. Louis-New Orleans nonstop authority have been consolidated. As indicated above, we find no warrant for considering in this proceeding the question of additional useable service in this market and we find that consideration of this Trans-Texas proposal would unduly expand the proceeding and unnecessarily delay its disposition. We have decided, therefore, to impose a pretrial restriction which would require Trans-Texas to make two stops in the St. Louis-New Orleans market in the event such an award is made to that carrier. The effect of our action herein will be to insure equal treatment for all carriers concerned." (Order No. E-23686, p. 4)
 
 
 [23]
 The examiner's findings with respect to the St. Louis-Houston proposals were (footnotes omitted):
 "Frontier and Trans-Texas propose St. Louis-Houston routes via Texarkana and Shreveport. For Frontier, this would involve an extension from Fort Smith via Texarkana and Shreveport, and would enable it to provide direct service to Houston from both Kansas City and St. Louis. Trans-Texas proposes a St. Louis-Houston route by the extension of its system north from Jonesboro, Little Rock, and Memphis to St. Louis and south from Texarkana to Houston via Shreveport.
 "Each applicant contends that it could operate the route at a profit and that it would reduce its subsidy needs. A revision of Frontier's estimates more realistically reflecting the revenues and expenses involved shows that Frontier would operate this route at a substantial loss.
 "Trans-Texas would operate this route at a profit of $140,000 if it were the only applicant to obtain the Memphis-St. Louis segment. This extension would not provide any substantial public benefit. Delta provides nonstop jet service between St. Louis and Houston which is supplemented by connecting services throughout the day. Braniff provides direct Kansas City-Houston service supplemented by frequent connecting schedules. San Antonio has frequent connecting service in each direction to St. Louis. No other substantial Kansas City or St. Louis traffic flow is involved.
 "Contrasted with this is the comparative benefits of alternative services. The St. Louis extension for Trans-Texas will be a loss operation with Ozark providing non-stop service between St. Louis and Memphis. Furthermore, it would divert substantial revenues in the Hot Springs-St. Louis market where Frontier carries three-fourths of the traffic, and by establishment of an additional Little Rock-Memphis round trip Trans-Texas would diminish the benefit to Frontier of its Memphis extension. Furthermore, authorization of Ozark to provide the St. Louis-Memphis service will result in a substantially greater reduction in subsidy than would the authorization of Trans-Texas for the St. Louis-Houston route. Under the circumstances, there is no justification for authorizing the proposed St. Louis-Houston route."