**WESTERN AIR LINES, INC.,**
Petitioner,

v.

**CIVIL AERONAUTICS BOARD,**
Respondent,

Alaska Airlines, Inc., et al., Intervenors.

**STATE OF ALASKA et al., Petitioners,**

v.

**CIVIL AERONAUTICS BOARD,**
Respondent,

Alaska Airlines, Inc., Intervenor.

**PAN AMERICAN WORLD AIRWAYS, INC., Petitioner,**

v.

**CIVIL AERONAUTICS BOARD,**
Respondent,

Alaska Airlines, Inc., Intervenor.

Nos. 72-1033, 72-1162 and 72-1165.

United States Court of Appeals, District of Columbia Circuit.

Argued June 16, 1972.

Decided Feb. 20, 1974.

James F. Bell, Washington, D. C., with whom Gerald P. O'Grady, Los Angeles, Cal., was on the brief, for petitioner in No. 71–1033.

M. Kenneth Frank, Asst. Atty. Gen., was on the brief for petitioner, State of Alaska.

M. T. Thomas, Juneau, Alaska, of the bar of the Supreme Court of Alaska, pro hac vice, by special leave of Court for petitioner in No. 72–1162.

Richard J. Fahy, Jr., New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court with whom Robert N. Duggan,

Washington, D. C., was on the brief for petitioner in No. 71–1165.

Warren L. Sharfman, Associate Gen. Counsel, Litigation and Research, C.A.B., with whom R. Tenny Johnson, Gen. Counsel, O. D. Ozment, Deputy Gen. Counsel, Ivars V. Mellups, Atty., C.A.B. and Howard E. Shapiro, Atty., Dept. of Justice, were on the brief for respondent.

Herman F. Scheurer, Jr., Washington, D. C., with whom Robert Reed Gray, Louis Hayner Kurrelmeyer, Washington, D. C., and Henry J. Camarot, Eugene, Or., were on the brief, for intervenor Alaska Airlines, Inc.

Lofton L. Tatum, Portland, Or., and Harry A. Bowen, Washington, D. C., filed a brief on behalf of City of Portland et al. as amici curiae urging reversal.

Edward A. Stahla, Ketchikan, Alaska, entered an appearance for intervenors, the City of Ketchikan et al. in No. 72–1033.

Before LEVENTHAL and ROBB, Circuit Judges, and WILLIAM J. JAMESON,* Senior U. S. District Judge for the District of Montana.

LEVENTHAL, Circuit Judge:

These consolidated petitions for review of an order of the Civil Aeronautics Board challenge the Board's decision to suspend the authority of two air carriers to operate on certain routes contained in permanent certificates, issued to them by the Board, pursuant to § 401 of the Federal Aviation Act, 49 U.S.C. § 1371. Acting under its power to "alter, amend, modify or suspend any . . . certificate . . . if the public convenience and necessity so require," 49 U.S.C. § 1371(g), the Board suspended the authority of Pan American World Airways and Western Air Lines to serve certain cities in Alaska. Simultaneously, the Board renewed the authority of another carrier, Alaska Airlines, to serve

the same cities. Petitioners Pan American and Western ask reversal of the Board's order insofar as it suspends their authority to serve these cities. The carrier petitioners are joined by petitioner State of Alaska and intervenors the City of Juneau, Alaska, and the Juneau Chamber of Commerce ("the Juneau parties"). The Juneau parties, in addition, challenge the authorization of Alaska Airlines to operate over the routes in question. Intervenor Alaska Airlines joins the Board in urging that the award of routes to it, and the suspensions of the other carriers, were proper. For the reasons set forth below, we affirm.

## I. STATEMENT OF FACTS

### A. Background of the Alaska Service Investigation

The Board orders under review stem from a proceeding known as the Alaska Service Investigation, instituted in March, 1969, as the latest of a series of periodic examinations by the Board of air transportation to and within Alaska. The previous such comprehensive investigation was conducted in 1965. After completion of that investigation, three carriers held authority to provide service along the Southeastern Alaskan routes which are the subject of this litigation: Pan American World Airways, a carrier with international operations, among them service from Seattle to Juneau and Fairbanks, Alaska; and Pacific Northern Airlines and Alaska Airlines, two regional carriers operating between Seattle and a variety of small cities in Southeast Alaska.[1]

The 1965 investigation had resulted in some adjustments to the Alaskan operations of these carriers. Pan American's authority to provide service between Seattle and Juneau was suspended for a seven-year period. At the same time, Pan American became the sole provider of non-stop service between Seattle and

---

* Sitting by designation pursuant to Title 28, U.S.C. § 294(d).

1. All routes described herein may be identified on the maps which appear in Appendix A of this Opinion.

Fairbanks as a result of the simultaneous suspension of Alaska Airlines' authority to provide that service.

The service which is in controversy in this litigation lies along the "inside" route from Seattle to Anchorage, a land route over Southeastern Alaska which includes the intermediate points of Ketchikan, Sitka, Juneau, Yakutat and Cordova. This inside route is to be distinguished from the direct, over-water route from Seattle to Anchorage.

As the 1969 Alaska Service Investigation began, two carriers were operating along the inside route. Western Airlines, a carrier serving many western continental U.S. cities, had acquired Pacific Northern Airlines by merger in 1967 and consequently was providing service, under a permanent certificate, between Seattle and Anchorage, including intermediate cities of Ketchikan, Juneau, Yakutat, and Cordova. Alaska Airlines, a carrier having predominantly intra-Alaskan operations, part of which were conducted under temporary authority, provided service along the same route as Western, but lacked the authority (held by Western) to fly Seattle-Anchorage and Seattle-Juneau non-stop runs. Pan American's permanent certificate embodied authority to operate between Seattle and Juneau, but the seven-year suspension of that authority, ordered in 1965, was still in effect.

During the course of the investigation, Western requested deletion of its authority to serve Cordova and Yakutat, on the northern segment of the inside route, because these operations were unprofitable. The Board granted Western's request on a temporary basis but reserved a final decision until completion of its comprehensive review of Alaskan air transportation.

B. *Decision of the Hearing Examiner*

In his opinion the Hearing Examiner announced the following general principles which would govern the authorization of service and assignment to carriers:

To provide Alaska with optimum air service requires (1) integrating its entire air system so that the stronger markets will help support the weaker, (2) direct and one carrier service to the maximum extent possible, (3) maintaining competition where economically feasible, (4) service to the smaller isolated points even if subsidy is necessary, (5) coordinating mail service with passenger and cargo service, and (6) imposing government supervision and control to insure adequate service to the smaller noncompetitive points.

Examiner's Initial Decision 16 ("I.D.").

The Examiner noted the "peculiar problems" of air transportation in Alaska: dependence upon air transportation because of lack of other modes, and, at the same time, population, climatic, and geographic characteristics which make provision of air transportation difficult and expensive. I.D. 14. The Examiner stressed that at many small points in Alaska the demand for air transportation was insufficient to support competitive service. He concluded that there was a need to structure routes so as to provide for route cross-subsidization,[2] but noted both that this need could not be the sole basis for an award, and that the interest of reducing govern-

---

2. When air transportation services which the Board finds necessary cannot be supported by the fares charged to users, the Board may provide government subsidy. The Board provides a subsidy by exercising its power to set mail rates which compensate carriers to the extent necessary to maintain air transportation "required for the commerce of the United States, the Postal Service and the national defense." 49 U.S.C. § 1376(b) (1970). Alternatively, the Board may structure award routes and set rates so that profits earned by a carrier on one route are available, in part, to offset revenue deficiencies on another. This use of internal profits is called cross-subsidization. Use of the internal subsidy allocates some of the burden of paying for below-cost service to users on other routes; mail pay subsidies, from federal revenue, puts the burden on taxpayers generally.

ment subsidy must not overshadow the need for adequate service (I.D. 16–17):

> While it is important that the revenues from heavily traveled segments be made available to support operations over the weaker routes and to reduce subsidy, attempts to reduce subsidy and strengthen weak carriers must not overshadow the need for adequate service.

> \*　\*　\*　\*　\*　\*

> Although good routes should be operated by those carriers which can use them to the greatest advantage in serving weaker segments and points, routes should not be awarded and competition eliminated merely to help the carriers with the largest operating deficits. There are numerous other causes for operating deficits besides poor route structure and lack of adequate markets. The Board should avoid route awards merely to cut subsidy and to help a weak carrier.

Four carriers made proposals to the Board for future service along the inside route. Western proposed to continue its Alaska service which remained after the temporary deletions approved by the Board. Alaska Airlines proposed continuation of existing service, and new service as well. Pan American intended to reinstate service on authorized routes upon expiration of its 1965 suspension. A fourth carrier, Wien Consolidated Airlines, then having entirely intra-Alaskan operations, also proposed new service from Seattle to Southeastern Alaska. I.D. 24. Two of these carriers, Wien and Alaska, were at that time sustaining net losses on their Alaskan operations and were receiving government subsidies.

In applying the principles of decision to the awards of service at issue here, the Examiner considered the inside route in two segments—the northern segment, from Juneau to Anchorage, and the southern segment, from Seattle to Juneau.

1. *Northern segment.* Three carriers proposed service between Juneau and Anchorage: Western, Alaska, and Wien.

The Examiner considered that the projected demand for this service would support only a single carrier. I.D. 35. Of the three carriers, only Alaska was willing to serve the intermediate points of Yakutat and Cordova—with Western, indeed, requesting that the deletion of these sites from its operating authority be made permanent—and this fact led the Examiner to prefer Alaska as the sole carrier. The Examiner found that by integrating service between Juneau and Anchorage with service to the intermediate points, Alaska could "arrange its schedules to provide [trips] daily in each direction at times most convenient to the public." I.D. 35. Accordingly the Examiner recommended rejection of Wien's application, permanent deletion of Western at Yakutat and Cordova, and suspension of Western's authority to offer Juneau-Anchorage non-stop service. I.D. 74.

2. *Southern segment.* After reviewing projections of traffic between Seattle, Ketchikan, Sitka and Juneau, the Examiner concluded that service to these cities could support competition by only two carriers. "Although a market of this size may not be the optimum for two carrier competition," the Examiner found two-carrier service justified by the lack of alternative modes of transportation. I.D. 25–26. He was faced with choosing among four carriers: Pan American, not then operating the route but authorized to do so under its permanent certificate; Western and Alaska, both currently operating; and Wien, which did not then possess any operating authority over the route.

The Examiner found Wien and Alaska the preferred carriers on several grounds. They proposed equipment equal in speed and comfort to that proposed by Western or Pan American. They would have more equipment available to meet varying demands, as compared with Pan American and Western. I.D. 31–33. They could integrate Seattle-Southeast Alaska operations with other intra-Alaska service they provided, offering easier connections to other

Alaskan cities to users. I.D. 27–28, 30. Finally, they were willing to undertake a package of services, including unprofitable ones. The importance of this last factor is underscored by the Examiner's view of Western's total proposal to retain Seattle-Juneau and Juneau-Anchorage non-stop service, but withdraw unprofitable service to intermediate cities on the inside route, as well as to other small Alaskan cities.[3] He observed:

> It is clear that Western is attempting to slough its unprofitable Alaska points and segments and retain only the profitable ones. To permit a large domestic trunk carrier to drain $2.5 million from Alaska and at the same time delete needed service at a saving of $3 million would be a step backward. Revenues earned by carriers from profitable Alaskan routes should, to the extent practicable, be available to pay for needed Alaskan services. I.D. 29–30.

The Examiner reiterated his conclusion that Western or Pan American could not profitably join a route already served by two carriers. He noted that Alaska and Wien should operate alone, because four-carrier competition would dissipate profits which would otherwise accrue to Alaska and Wien and become available to "support their other Alaskan operations," I.D. 32. Accordingly, the Examiner recommended a seven-year suspension of Western's Seattle-Ketchikan-Juneau authority, and a renewal of Pan American's suspension. Alaska was to offer Juneau-Sitka-Ketchigan-Seattle service and Seattle-Juneau non-stop service, and Wien was to be given temporary authority to provide Seattle-Juneau non-stop service.

## C. *The Board's Order*

The Board affirmed the Examiner's recommended suspensions and the selection of Alaska to operate between inside route cities. Board Opinion ("Op.") 13. The Board, however, reversed the Examiner's award of Seattle-Juneau non-stop service to Wien, on the grounds that (1) there was no need for two-carrier competition on the route; (2) such competition could endanger the profitability of Alaska Airlines' competing service; and (3) Wien would have difficulty establishing service to the continental states. Op. at 8–10, 25–27.

In addressing the problem of service along the inside route, the Board began by noting that "if all carriers exercised their certificate rights at all the points in question, the result, at current and foreseeable traffic levels, would be wasteful and uneconomic service." Op. 15. The Board found the Examiner's projections of traffic generally too optimistic, and disapproved his inflation of a traffic growth rate based upon economic stimuli which he thought would be provided by exploitation of North Slope oil resources. Op. 6. Using more conservative demand projections, the Board rejected the Examiner's conclusion that Seattle-Juneau service would support operations by two carriers, and projected losses for second-carrier service by either Western or Pan American. Op. 16 n. 20.

In choosing a single carrier to provide inside route service, the Board stated that Pan American and Western possessed an advantage in "their status as certified incumbents," but also noted that "in virtually all other respects, the traditional decisional criteria employed in route proceedings support Alaska's selection." Op. 16. The Board regarded Western's proposed service as comparatively inferior because it offered no non-stop Seattle-Juneau flights during peak season, and no turn-around round trips on the Seattle-Juneau-Anchorage runs. Also, Western proposed flights on the northern segment of the inside route only "as an adjunct of long-haul operations originating in various Southwestern

---

3. In addition to seeking withdrawal from Yakutat and Cordova, Western asked the Board's permission to delete service to King Salmon, Homer, and Kenai, to discontinue Kodiac-Anchorage service, and to reduce service between Seattle and Kodiac, on the ground that all the foreging operations were unprofitable.

[continental] cities." Similarly, the Board found that Pan American's selection over Alaska would "result in a sharply reduced level of service for Seattle-southeast Alaska passengers." Op. 16–17.

Alaska Airlines, however, was favored because of its ability and incentive to integrate inside route service with service to other Alaska points. The Board concluded:

> Alaska Airlines, as an Alaska transportation specialist with long experience in serving southeast Alaska and Juneau/Yakutat/Cordova/Anchorage traffic, and with considerable identity at Seattle, would concentrate on responding to the air travel needs of passengers in these Alaska markets. By combining nonstop operations in the larger Seattle-Juneau and Juneau-Anchorage markets with one- or two-stop flights via intermediate points, Alaska will offer far more total frequencies than any other applicant. Op. 17–18.

The Board also noted that the assignment to Alaska would allow combining profitable and unprofitable service with a single carrier so as to permit route cross-subsidization in preference to government subsidy under 49 U.S.C. § 1376.

The Board ordered a suspension of Pan American's authority to operate between Seattle, Ketchikan and Juneau, and of Western's authority on that route and on the Juneau-Anchorage route. Western, however, retained its Seattle-Anchorage non-stop runs. Alaska's existing authority along the inside route was augmented to allow it to conduct Seattle-Juneau, Juneau-Anchorage, and Seattle-Anchorage non-stop service, as well as to serve intermediate points, for a seven-year period.

At the same time, Pan American received assurance of continuation as sole provider of Seattle-Fairbanks non-stop service, described by the Board as the "single largest market at issue." Op. 27. Alaska was then providing service to Fairbanks via Anchorage and was carrying most of the traffic to Fair-banks. Op. 28. In addition Alaska proposed more non-stop frequencies to Fairbanks than Pan American did. However, the suspension of Alaska's authority to provide non-stop service, first imposed in 1965, was continued.

Finally, the Board addressed itself to the duration of the route adjustments it had ordered, as follows (Op. 20):

> [W]e recognize that the pattern we are now establishing calls for significant changes in existing Pacific Northwest/southeast Alaska/Anchorage services, and that a final evaluation of this new pattern can be made only on the basis of operating experience. Therefore, we will limit our award to Alaska (and the corresponding suspensions of Western and Pan American) to a temporary, experimental period which will permit us to re-evaluate our decision with the benefit of such experience, and will, in general, provide the Board with maximum decisional flexibility in responding to changing economic conditions. We believe that the seven-year duration adopted by the examiner represents a reasonable test period, long enough to provide Alaska an adequate opportunity to develop its service in these markets and enable it to obtain any financing it might find necessary to acquire or maintain equipment or facilities.

D. *Contentions of the Parties*

Pan American and Western, in their petitions for review, challenge certain findings made by the Board and urge that a seven-year suspension of their operating authority is beyond the Board's power. The carriers are joined by petitioner state of Alaska and the Juneau parties as intervenors, the latter urging in addition that the Board did not make requisite findings of Alaska's witness to provide service. Alaska has intervened in support of the Board's order, urging that it acted properly in the selection of Alaska and the suspensions of Pan American's and Western's authority.

We first consider the objections to the Board's findings and then turn to the issue of the Board's power to order the suspensions.

## II. THE PERTINENT FINDINGS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE

█ In reviewing the Board's action, we are bound by the Board's findings of fact if supported by substantial evidence. 49 U.S.C. § 1486(e). If the findings are supported by substantial evidence, we must accept also the conclusions drawn therefrom unless they are seen to be arbitrary or capricious, or to rest on premises that are deemed contrary to ascertainable legislative intent, or are otherwise contrary to law. Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841, cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971). In applying the substantial evidence test, "we are obliged to search the entire record, or those parts of it to which the parties refer us, to determine whether . . . the agency . . . could fairly and reasonably find the facts as it did." Braniff Airways, Inc. v. CAB, 126 U.S. App.D.C. 399, 408, 379 F.2d 453, 462 (1967). A conclusion may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view. See Lorain Journal Company v. FCC, 122 U.S.App.D.C. 127, 351 F.2d 824 (1965).

Applying the foregoing principles to the Board's action here, we have no difficulty in rejecting the objections made to its conclusions.

### A. *Findings That Routes Would Not Support Competition*

#### 1. *Juneau-Anchorage*

█ Both the Examiner and the Board found that the Juneau-Anchorage non-stop service would support only one carrier. This conclusion was not seriously disputed before the Board, and indeed the carriers do not attack it here. There is a protest in the petition for reconsideration of the Alaska Transportation Commission, that "the Board erred in accepting the winner-take-all representations of carrier parties that no nonstop service competition could be maintained between Juneau and Anchorage. . . ." (p. 4 ¶ 5). The State's objection is sketchy and lacks any specific reference to the record.

We have examined those portions of the record we discern as pertinent, and we see no basis for judicial interposition. The Examiner projected annual profits for Alaska Airlines on the Juneau-Anchorage non-stop service amounting to $838 thousand with more than $600 thousand as profits available for cross-subsidization of other routes. I.D., App. 3 at 1.

There is some divergence in outlook between findings that competition between two carriers is not viable on a route, and that one carrier will nevertheless generate "excess profits" available for cross subsidization. But there is no inherent inconsistency. Perhaps some explication should have been supplied, but we fairly discern the Board's analysis as reflecting a conclusion that the objectives entrusted to it—which include the promotion of air transportation for commercial, mail and defense needs —would be best served by permitting service by a single carrier, allowed to generate supra-competitive profits while simultaneously undertaking unprofitable local service requiring subsidization. The Board was avoiding what it viewed as a considerable risk that the market would not be large enough to support the active competition of two carriers operating at a reasonable profit.

█ The Board projected that profits on Juneau-Anchorage service would offset inadequate revenue on the service to the smaller intermediate cities.[4] While

---

4. The Examiner had projected a "subsidy need" of $196 thousand on Alaska's service to Cordova and Yakutat. I.D., App. 3, at 1.

the practice of allowing route cross-subsidization has been criticized,[5] and it breeds problems that require that it be kept under strict surveillance, it cannot be doubted that the Board has the power to permit it. *See, e. g.,* United Airlines v. CAB, 81 U.S.App.D.C. 89, 155 F.2d 169 (1946). On several occasions, this approach has been expressly approved by the Supreme Court. *See* American Trucking Assoc. v. United States, 355 U.S. 141, 78 S.Ct. 165, 2 L.Ed.2d 158 (1957); Baltimore & O. R. R. v. United States, 345 U.S. 146, 73 S.St. 592, 97 L.Ed. 912 (1953).

We revert again to the fact that the Board's conclusion that only a single carrier should serve the route was not disputed by any of the petitioner carriers— those who would have the most to gain from access to the market as competitors, if they thought it would really be profitable, and who also would have the incentive to sharpen their pencils to calculate whether a substantially profitable opportunity was being withheld. This case must be viewed against the Board's view that traffic forecasts in Alaska were uncertain. It was permissible for the Board to say, in effect, "we believe the route will support only a single carrier, but if we have underestimated demand, desirable cross-subsidization will occur." [6]

### 2. Seattle-Juneau

Although the Examiner found that two carriers could serve Juneau-Seattle and the intermediate stop of Ketchikan, the Board disagreed, saying "we find no substantial evidence of an affirmative need for competitive service." Op. at 16. We would be concerned if the Board presumed competition inappropriate on a route for which several carriers were already certificated, and had placed the burden of a contrary demonstration on the carrier. But that is not what the Board did, as we see it.

What the Board did was to disagree with the Hearing Examiner's projections of demand for services, believing that the Examiner had relied unduly upon a speculative industrial growth of Alaska. The Board used demand projections made by the agency's Bureau of Operating Rights (which the Examiner had regarded as too low) and on the basis of these calculations concluded that the route would sustain only single-carrier service. Op. 6–8. Specifically, the Board found that either Pan American or Western would incur losses by providing second-carrier service on the Juneau-Seattle run the Board was assigning to Alaska. Although this is a finding, it is in the area of prediction and projection, as to which particular latitude is accorded the agency. The Board was entitled to take a more conservative view than the Examiner where the evidence would permit it to project either way. Lorain Journal v. FCC, *supra.* There was substantial evidence to support the Board's projection, and it was neither arbitrary nor capricious.

The Juneau parties contend that the Board's finding of no competitive service is inconsistent with its selection of Alaska as the appropriate single carrier partly because it proposed more frequent flights. The Juneau parties say that "the problem of uneconomic competition is largely illusory since by voluntary agreement and conditions imposed by the Board, point to point competition could easily be avoided." Juneau brief at 25. The Board was not required to start a fire merely because it would have means which would in all probability enable it to cope with the fire before it got out of hand. The Board may rightly avoid competition it

---

5. *See, e. g.,* R. Caves, Air Transport and Its Regulators: An Industry Study 435–40 (1962); G. Eads, The Local Service Airline Experiment 169–72 (1972).

6. The Board, of course, can control Alaska Airlines' future revenues in a rate setting proceeding, and thus may reasonably have concluded that any underestimation of its profitability on inside route operations could be subsequently corrected.

reasonably believes will result in an offer of more services than the market will require and support, especially when the remedy—direct regulation of a carrier's level of services—embroils the Board in the minutiae of operations. The Board does not act unreasonably if it seeks, so far as feasible, to leave the details of operations to private management, and to frame its role in terms of broad surveillance. The fact that the Board might have accomplished the same result by other methods does not invalidate its choice. Philadelphia Television Broadcasting Co. v. FCC, 123 U.S.App.D.C. 298, 359 F.2d 282 (1966).

### B. Finding That Alaska Offered Superior Service

■ Having concluded that a single carrier should provide service on the inside route, the Board found the service proposed by Alaska to be comparatively superior to that offered by either Pan American or Western. The Board explained at length the reasons for its preference for Alaska.[7] The Board was not insensitive to the status of Pan American and Western as holders of permanent certificate authority on the routes, for it stated at the outset of its opinion that "certificated incumbents are entitled to have their existing stake and historic identity in the subject markets accorded considerable decisional significance. . . ." Op. 4. But the Board found the advantage conferred by incumbency outweighed by the other consideration it set out.

Western contends that the Board failed to consider the advantages it could offer Alaskan users by its ability to integrate Alaskan service with its other continental service. The Examiner considered these asserted benefits and found

them overstated and, in any event, outweighed by Alaska's ability to integrate service with other intra-Alaskan operations. I.D. 30. The Board agreed. Op. 18. The Board's conclusion that Alaska was the preferred carrier is supported by substantial evidence and reasonable analysis.

### C. Findings of Alaska's Fitness To Perform Service

■ Before the Board may issue a certificate authorizing air transportation to any carrier it must find that the carrier is "fit, willing and able properly to perform" the transportation authorized. The Board has given content to this language through its decisions, focusing mainly on the adequacy of (1) technical and managerial resources and (2) financial resources available to the carrier. See Braniff Airways v. CAB, 79 U.S.App.D.C. 341, 147 F.2d 152 (1945); United States-Alaska Service Case, 14 CAB 122, 136 (1951).

Both the Examiner and the Board made findings of fitness which track the statutory language. The Juneau parties, however, attack the finding of Alaska's financial fitness to provide the transportation authorized. Brief of Juneau parties at 18-21. Responding to an objection raised by Western in its petition for reconsideration, the Board said:

> While we are aware of Alaska's heavy losses in recent years and its current financial difficulties, the carrier has a long history of certificated operations between Seattle and Alaska and in mainline intra-Alaska regional markets. Furthermore, it is already certificated and has considerable identity at all the points in issue, so that our award should not involve unusually high pre-operating expenses or other absorp-

---

7. It is no objection to say, as the Juneau parties do, that the Board's findings were based upon Alaska's service proposals. When the Board considers a carrier for a route it has not previously served it may naturally rely upon proposed service. Nor is it an objection that the Board, having chosen Alaska, failed to write into its certificate the obliga-

tion to provide every flight it had proposed. The carrier is obliged, under 49 U.S.C. § 1374, to provide "safe and adequate service," and the Board will, pursuant to its regulations, investigate adequacy of service upon complaint or petition, or on its own motion. See 14 C.F.R. §§ 302.700-.704 (1973).

tion costs. Finally, the new, experimental service pattern we have adopted in southeast Alaska will be a source of immediate strengthening for Alaska, resulting, in our judgment, in a marked improvement in the carrier's financial posture in the very first year of operations. Under the circumstances, we conclude on the record before us that Alaska is fit, willing and able to perform the air transportation we have authorized, in the context of the overall southeast Alaska route structure we have established in this proceeding.

Opinion on Reconsideration at 10.

██ Alaska's past unprofitable ventures did not preclude the Board from concluding that in light of new awards, the carrier would obtain financial resources necessary to provide service. The Juneau parties do not seriously dispute this, but lean heavily on the Board's later reference to Alaska's "serious, perhaps critical" financial condition as a reason for refusing to stay its award pending appeal. Opinion on Reconsideration at 13. The forecast of the consequence of a stay of award is not inconsistent with a finding of fitness based upon the position that would develop when the award became effective. We see no infirmity in the Board's finding of fitness.

## III. THE BOARD'S POWER TO ORDER THE SUSPENSIONS

██ We turn, finally, to the contention pressed most vigorously by the carrier petitioners. Notwithstanding the Board's conclusions that the routes in issue would not support operations by all carriers possessing operating authority over them, and that Alaska's service proposals were superior to the others, the petitioner carriers argue that the Board exceeded its statutory power by suspending Western and Pan American, two permanently certificated carriers, for a seven-year period, and issuing a seven-year temporary authority in favor of Alaska. Consideration of this contention requires a brief discussion of the Board's regulatory power under the Federal Aviation Act.

### A. *Board's General Power To Suspend Permanent Certificates*

Under § 401 of the Federal Aviation Act, as amended, 49 U.S.C. § 1371, the Board is empowered to issue certificates authorizing their holders to engage in air transportation "required by the public convenience and necessity." The Board may issue temporary certificates, authorizing service "for such limited periods as may be required by the public convenience and necessity," § 1371 (d)(2), or the Board may issue permanent certificates, having no expiration date, § 1371(d)(1). Temporary certificates must, of course be extended by an order of renewal effective at date of certificate expiration.

Operations performed under a certificate are subject to continuing supervision by the Board. The Board may revoke any certificate prior to expiration "for intentional failure to comply with any provision of [the Act] or any order, rule, or regulation" issued by the Board or any "term, condition, or limitation" contained in the certificate, § 1371 (g). The Board is also empowered, upon "petition or complaint or upon its own initiative" to "alter, amend, modify, or suspend any . . . certificate, in whole or in part, if the public convenience and necessity so require." § 1371 (g). It is the power to suspend which the Board invoked as to Pan American and Western.

The limitations on the Board's power to revoke a certificate—requiring, after notice and hearing, a finding of an "intentional failure to comply," as well as the allowance of a reasonable time for compliance with a Board order commanding obedience to the provision of law found to have been violated—evidence a Congressional intent to provide holders of certificates with some security against the termination of the authority granted thereunder. CAB v. Delta Air-

lines, 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869 (1961).

■ The "alter, amend, modify or suspend" language of § 1371, however, empowers the Board to make changes in a carrier's operating authority even when it is granted by a permanent certificate. Congress did not enact a scheme that limited the Board merely to creation of entry barriers, installing each permanently certificated carrier indefinitely, free to remain until it chose to withdraw in the face of competition or reduced demand. The Board was given the power to respond to changed economic conditions and redefinitions of the "public convenience and necessity" by adjusting the operating authority of carriers. This authority has been recognized for at least twenty years. In the 1950's the Board, acting under its modification and suspension power, removed certain routes from the authority granted to trunk carriers and assigned them instead to local service carriers, which were frequently the sole providers of air service. See G. C. Eads, The Local Service Airline Experiment 112 (1972). As the Seventh Circuit said then in rejecting a trunk carrier's challenge to Board action:

> It seems unreasonable that Congress intended to give the Board power to grant certificate rights, but to deny it any authority to modify them to meet the changing demands of commerce and the national defense. The need for some flexibility in an industry is characterized by continual and rapid changes is apparent.

United Air Lines v. CAB, 198 F.2d 100, 106 (7th Cir. 1952). *See also* Western Air Lines v. CAB, 196 F.2d 933 (9th Cir. 1952); Alaska Airlines v. CAB, 109 U.S. App.D.C. 230, 285 F.2d 672 (1960).

## B. *The Seven-Year Suspensions*

■ The carriers do not essentially dispute the foregoing as a general analy-

sis, but assert that a seven-year deprivation of operating authority granted under a permanent certificate is outside the limits of the Board's power to "alter, amend, modify or suspend," at least where some operating authority is retained by or given to a carrier under a temporary certificate.

The Board's power to revoke a certificate is limited, in the interest of route security, by provisions that are not applicable to the power given to the Board to modify or suspend, in the interest of flexibility. The reconciliation of the interests of security and flexibility is itself a matter of line-drawing, in which the court rightly looks for guidance to the Board at least in the first instance, so that the "spotlight of accountability for the health of air transportation" remains focused on the Board. Frontier Airlines v. CAB, 142 U.S.App.D.C. 124, 131, 439 F.2d 634, 641 (1971).

Historically the Board has shown restraint in the employment of its power to "alter, amend, modify, or suspend" certificates. It has evolved a self-imposed limitation on its modification power, limiting itself to those modifications which do not result in a "basic transformation" of a carrier's operations. Panagra Terminal Investigation, 4 C.A.B. 670 (1944). *See also* Alaska Airlines v. CAB, supra. Similarly, the Board has used its suspension power in restrained fashion, generally limiting suspensions to periods considerably shorter than those at issue here.[8]

The deprivation wrought by the suspensions of Western and Pan American must be viewed in the context of the unique Alaska problem, and measured with reference to the total effort of the Board to deal with Alaska air transportation. The Board took measures to strengthen each carrier operating in Alaska—Western, by allowing it to delete services to five small cities in Southeastern Alaska which were unprofita-

---

8. Three- and four-year suspensions were upheld in United Air Lines v. CAB, 198 F.2d 100 (7th Cir. 1952). See also Western Air Lines v. CAB, 196 F.2d 933 (9th Cir. 1952) (suspension); Alaska Airlines v. CAB, *supra* (modification).

ble;[9] Pan American, by allowing it to continue as the sole carrier operating non-stop between Seattle and Fairbanks, a route described by the Board as the "largest single market at issue;" and Alaska by granting it, for a seven-year period, sole carrier status along the "inside" route. The net result of the Board's action is likely to be a gain by all carriers.[10]

Alaska is the kind of situation that leads men to long-range expectations, and Pan American and Western, by retention of their permanent certificates (albeit subject to suspension) have the "security" of participating in the long-range air transport markets generally projected for our 49th state.

The Board candidly acknowledged uncertainty in the demand forecasts on which it based its decisions and perceived the need to reexamine route structure after the passage of a reasonable period. The duration of the period seems peculiarly a matter for the Board's judgment, since it involves not only a judgment about the reliability of forecasting market conditions but also a balancing of the pro's and con's of more frequent review of Alaska market conditions, including assessment of alternative uses of the Board's investigative and decisional resources. It has previously used a seven-year period for suspensions in regard to Alaska certificates, and while this is not the kind of matter to

be approached in terms of *stare decisis,* the Board's consistency indicates that it was not reaching out to break new ground in order to undercut Western and Pan American.

We are sensitive, however, to the concern which emerges from the contentions of the carrier petitioners, that they are being foreclosed for seven years from a market in which conditions may change dramatically. Similarly, the arguments of the non-carrier litigants bespeak a concern over the chilling consequence of route awards kept frozen too long in a changing situation.

The Board's opinion signifies that it, too, will be sensitive to these concerns. The Board noted that Alaska offers the promise of economic development in the exploitation of North Slope oil reserves, the settlement of native claims, and continued expansion in lumber, fishing, mining, and tourist industries. Op. at 6. The Board characterized these as "hopeful but indeterminate" developments and declined to ground any predictions of increased demand in them. We believe the Board stands ready to reexamine the necessity for continued suspension should a significant change be realized as to one or more of these "hopeful" developments. The Board can do so on its own motion or it may entertain the petition of any of the parties alleging that substantial and material developments, alluded to by

9. The Examiner had concluded that the effect of all the proposed adjustments to Western's authority, including those which it sought, would produce a net gain of $500 thousand annually. The Board re-affirmed this finding. Op. 24.

10. We have no occasion to become embroiled in the discussion between the carriers and the Board over the proper method of applying the Board's "basic transformation test" in alteration or modification of certificates. Pan American and Western assert that in measuring the impact of a contemplated modification of a carrier's certificate, the Board must look only to the carrier's operations described in that certificate. The Board responds that the division of a carrier's entire operations among several certificates is largely a matter

of historical accident, and that a measurement of economic impact which looks only to operations authorized by a single certificate exalts form over substance. In our past decisions we have recognized that in determining the impact of a proposed modification the Board must undertake a realistic economic assessment, which includes an examination of "overall economic factors of revenue, expense, and volume of traffic." *See* Alaska Airlines v. CAB, 109 U.S.App.D.C. 230, 232, 285 F.2d 672, 674 (1960). Whatever may be the limits of the Board's modification authority, the Board's approach here, which took into account the totality of its action in the region under investigation, embodies a realistic assessment of economic impact that we think is fairly embraced within the concept of modification.

the Board in its order but then incapable of precise estimation, make the continued suspension of certificated carriers inappropriate. We are confident that the Board will give fair consideration to any such representations submitted to it after a reasonable time, while at the same time protecting its administrative resources from exhaustion in engaging frivolous claims. On this understanding of the Board's posture, we hold that its suspensions of Pan American and Western on the inside route are lawful.

Affirmed.

APPENDIX

Southeast Alaskan Operations Suspended By Board's Final Order

APPENDIX

Southeast Alaskan Operations Authorized By Board's Final Order

Legend

———— Alaska Airlines

— — — Pan American Airways

• • • • Western Airlines